## Case No. 7,272.

### JENKINS v. MAYER.

[2 Biss. 303: [1] 3 N. B. R. 776 (Quarto. 189).]

District Court, N. D. Illinois. May Term, 1870.

Rich & Noble. for assignee.
Hoyne, Horton & Hoyne, for defendant.

BLODGETT, District Judge. The facts elicited in the evidence are substantially these: Up to some time in August, 1869, the bankrupt Heffron and one A. H. Hovey were in partnership as seedsmen and florists, and also as dealers in statuary, pictures and works of art. For the better transaction of the latter branch of their business, they had a "fine art gallery." where articles in that line were exhibited and remained for sale on commission. In the course of this business Constant Mayer, one of the respondents, had forwarded to them a valuable picture, entitled "Good Words." to be sold on commission.

In August the co-partnership was dissolved. and the business of the firm continued by Heffron. In September or October this picture was sold for $3.000, to be paid for about the 1st of November. Some time in September Heffron left Chicago for the East, and entrusted the general management of his business to his former partner, Mr. A. H. Hovey, who had power to sign checks and notes. In the latter part of October a note of Heffron's came due at one of the banks in this city, and Hovey, having no other available resources, collected the amount due on the picture sold for Mayer. and used the proceeds for the payment of the note. Heffron, who was at the time at Utica, N. Y., on business, on being ad-

[1] [Reported by Josiah H. Bissell, Esq., and here reprinted by permission.]

vised of this act on the part of his agent, wrote to Mayer, apologizing for the use of his money, and enclosing his draft at thirty days for the amount. On the receipt of this letter, Mayer at once wrote to Messrs. Hoyne, Horton & Hoyne. his attorneys here, directing them to proceed to collect the money at once by attachment, and denouncing Heffron for this unauthorized use of his money. When this letter came to the hands of Mayer's attorneys here, Heffron was still absent, and Hovey in the general charge of his business. The attorneys called upon Hovey for a settlement of their client's demand, and informed him of their instructions in the premises. Hovey assured the attorneys that Heffron was abundantly solvent and able to pay his debts, but that he was unavoidably detained at the East by the illness of his wife, and that when he returned. which they expected would be in a few days, the money would certainly be paid, and proffered them security if they would not commence suit. The result of the interview was that Hovey. as attorney and agent for Heffron. made and executed a bill of sale under seal. absolute on its face, to Mayer for a lot of pictures, works of art, and other property, the value of which was about $5.400, as stated in the schedule thereof, but the real purpose of which was to make Mayer secure for the amount of his funds thus appropriated to Heffron's use by Hovey. At the same time this bill of sale was executed by Hovey the property described therein was nominally turned over to J. Albert Hovey. a young man who seems to have been partially employed about the premises, to hold for Mayer; but the goods were not removed from the store, nor their visible possession and ownership changed. It is conceded that A. H. Hovey had no authority under seal to execute the bill of sale, his sole authority in writing resting on a letter from Heffron, authorizing him to sign checks and notes, and attend to his, Heffron's. business. About the 1st of December Heffron returned. and resumed the control of his affairs. He was informed of this transaction between Hovey. as his agent, and Hoyne, Horton & Hoyne. as attorneys for Mayer, and replied, "he should not have done so, if here; yet, as it was done, the arrangement had better be carried out;" or words to that effect. Soon after his return a proposition was made by some customer to change a picture he had for one of those conveyed by the bill of sale. and pay the sum of $600 difference; and. after consultation with Hoyne. Horton & Hoyne. this exchange was effected. and the $600 was paid directly over to Messrs. Hoyne. Horton & Hoyne by the purchaser. and by them credited to Heffron on the amount due Mayer. Subsequently Heffron placed a large portion of his works of art in the hands of an auctioneer for sale at auction. among which were a part of the goods included in the bill

of sale, and a portion, about $600 or $800 worth of the goods mentioned in the bill of sale were sold. And on or about the 20th of December last, Heffron paid to said attorneys, for Mayer, $1,000 more. Since the commencement of the proceeding in bankruptcy against Heffron, another picture included in the bill of sale has been sold for $150, and the proceeds of which are in the hands of E. I. Tinkham, provisional assignee, subject to the decision of the questions involved in this cause. It is also agreed that a lot of potatoes included in the bill of sale have been sold for $240, and the proceeds are held subject to this decision. It is objected that this transaction is fraudulent as against the assignee of Heffron, because: First. It gave Mayer, a creditor, an undue preference over the other creditors of Heffron. Second. Hovey, the agent of Heffron, who executed the bill of sale, had no sufficient authority for his acts in that regard. Third. Said goods were suffered to remain in the control of the bankrupt without visible change, of control, or possession.

In support of the first point numerous decisions by my predecessor and other district courts have been cited, all tending to establish the conceded point that any act intended to give a preference is void under the bankrupt act. The reason and authority of these decisions is not denied, but the question is, was this a case where a preference, such as is prohibited by the act, was intended. Heffron, by his agent, had unlawfully used the funds of Mayer coming into his hands, and had offered his draft, due in thirty days, for the money thus appropriated. Mayer refuses to accept the draft, but directs his attorneys to commence suit by attachment at once; and Hovey, who had acted for Heffron in the use of the funds, and who was still acting for him, proposed to turn over the goods in question to secure the payment of the money, saying he had no doubt it would be adjusted immediately on Heffron's return, which was daily expected. And the attorneys of Mayer took the responsibility of accepting the security, instead of commencing suit as their client had directed. These facts seem to me clearly to take the case out of the class of cases cited. There is no pretense that Mayer or his attorneys had any actual knowledge of Heffron's insolvency at the time this transaction took place, although there is evidence going to show that he was, in fact, insolvent at the time, but was not himself aware of the fact, nor was Hovey, his general agent, so aware. But it is claimed that the cases cited show that "insolvency consists in present inability to pay debts," and that Mayer, through his attorneys, knew that he could not pay this debt, and was therefore insolvent. This rule might apply if Heffron had been present and the negotiations had been with him. But he was absent, and that absence was alleged as the sole reason for non-payment, and the reasons given for such absence were not such as would excite any suspicion of insolvency or present inability to pay. Clerks and agents are not supposed to have entire control of the resources of their principal to such an extent as to make their failure to meet an obligation of their principal an act of bankruptcy against him.

And, in this case the proof is ample that no suspicion of insolvency had entered the mind of Heffron or his agent. Hovey. The bill of sale was executed as a temporary expedient to indemnify the attorneys for the responsibility they took in disregarding the instructions of their client, by withholding the suit he had instructed them to commence. I do not think, therefore, that the evidence shows this to be a case of fraudulent preference of a creditor within the bankrupt act, and the cases cited which have arisen under it.

In regard to the second point, that Hovey had no authority to execute the bill of sale, I deem it sufficient to say that it did not require a written authority, and that Mr. Heffron, before the proceedings in bankruptcy, and immediately on his return, ratified the act of Hovey and acquiesced in the same. It is objected that the bill of sale being under seal, the ratification must be by as solemn an instrument; but this, I apprehend, only applies when it is necessary that the original should have been under seal. As to the other objection, that the goods should have been separated, the evidence shows they were placed in charge of J. Albert Hovey, and that Mr. Heffron acquiesced in his assumed custody; and as there is no evidence that any creditor or purchaser was deceived or misled, I shall deem it good between the parties, and only concede to the assignee the assertion of such rights in regard to the property as Heffron might have asserted at the time proceedings in bankruptcy were commenced.

As to that part of the petition which claims a refunding to the assignee of the money received from Heffron since the bill of sale was executed, this depends upon the question whether the transaction between Heffron, through Hovey, his agent, and Mayer, through his attorney, was valid, and whether that, although an absolute sale on its face, was, in fact, only a pledge. Having come to the conclusion that this was a valid pledge of the goods, it seems to me that money paid to redeem the goods from that pledge cannot be recovered back. It seems clearly for the interest of the estate that the goods thus pledged, being of much greater value than the debt, should be redeemed, in order that the creditors may have the benefit of the excess in value over the debt secured by them.